STROUD, Judge.
Respondent appeals from an order terminating his parental rights to his minor child. After careful consideration, we reverse and remand.
I. Background
In March of 2015, the Buncombe County Department of Social Services ("DSS") filed a petition alleging Rudy[1] , then one year old, was an abused, neglected, and dependent juvenile, after having been injured when his mother and her boyfriend got into a fight and upon testing positive for marijuana, cocaine, and methamphetamine. DSS received non-secure custody of Rudy. Rudy's mother is not a party to this case, and his father, respondent, stated during the hearing regarding the termination of his parental rights that he originally told DSS he did not want custody of Rudy because he did not know if Rudy was his child. In August of 2015, the district court adjudicated Rudy neglected and dependent, and the order noted that paternity had been established with respondent. Around May of 2016, the trial court entered an order establishing a primary permanent plan of adoption. DSS filed a petition to terminate parental rights, and in January of 2017, the district court entered an order terminating respondent's parental rights on the grounds of neglect, failure to make reasonable progress, failure to pay a portion of the costs, and abandonment. Respondent appeals.
II. Failure to Pay a Reasonable Portion of the Costs and Abandonment
Respondent first contends the trial court erred by concluding in the order that he had failed to pay a portion of the costs for the care of Rudy and had abandoned Rudy "because the trial court's orally-rendered order at the TPR hearing was that DSS had failed to prove those two TPR grounds." (Original in all caps.) Indeed, the transcript confirms that the trial court stated it was "not adopting[,]" the grounds of failure to pay a portion of the costs of care and abandonment. Although the written, filed order may include provisions which are different from the oral rendition of the trial court's ruling, see *172 In re O.D.S. , ---- N.C. App. ----, 786 S.E.2d 410, 415, ("The announcement of judgment in open court is the mere rendering of judgment, and is subject to change before 'entry of judgment.' A judgment is entered when it is reduced to writing, signed by the judge, and filed with the clerk of court.") (citations and quotation marks omitted), disc. review denied , 369 N.C. 43, 792 S.E.2d 504 (2016), in this instance, from the transcript it appears that these grounds should not have been included. In addition, DSS acknowledges that the grounds of failure to pay costs and abandonment should not have been included in the order. We therefore reverse the grounds of failure to pay costs and abandonment and turn to the remaining two grounds, neglect and failure to make reasonable progress.
III. Neglect and Failure to Make Reasonable Progress
North Carolina General Statute § 7B-1111(a)(1) provides that a trial court may terminate parental rights upon a finding that the parent has neglected the juvenile. N.C. Gen. Stat. § 7B-1111(a)(1) (2015). A neglected juvenile is
[a] juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or the custody of whom has been unlawfully transferred under G.S. 14-321.2 ; or who has been placed for care or adoption in violation of law. In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.
N.C. Gen. Stat. § 7B-101(15) (Supp. 2016).
At the adjudicatory stage, the party petitioning for the termination must show by clear, cogent, and convincing evidence that grounds authorizing the termination of parental rights exist. If the trial court concludes that the petitioner has proven grounds for termination, this Court must determine on appeal whether the court's findings of fact are based upon clear, cogent and convincing evidence and whether the findings support the conclusions of law. Factual findings that are supported by the evidence are binding on appeal, even though there may be evidence to the contrary. Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal.
In re L.A.B. , 178 N.C. App. 295, 298, 631 S.E.2d 61, 64 (2006) (citations, quotation marks, and brackets omitted).
[T]o reach the legal conclusion of neglect, the trial court must determine neglect exists at the time of the termination of parental rights proceeding. The trial court must consider evidence of changed conditions following the adjudication and must evaluate the probability of repetition of neglect. Where the evidence shows a likelihood of repetition of neglect, the trial court may reach a conclusion of neglect under N.C. Gen. Stat. § 7B-1111(a)(1).
Relevant to the determination of probability of repetition of neglect is whether the parent has made any meaningful progress in eliminating the conditions that led to the removal of the children. That a parent provides love and affection to a child does not prevent a finding of neglect. Neglect exists where the parent has failed in the past to meet the child's physical and economic needs and it appears that the parent will not, or cannot, correct those inadequate conditions within a reasonable time.
In re J.H.K. , 215 N.C. App. 364, 368-69, 715 S.E.2d 563, 567 (2011) (citations, quotation marks, and brackets omitted).
While respondent challenges several findings of fact, respondent does not challenge the findings establishing that:
35. At disposition, the Court ordered that the respondent father participate in a CCA and follow all recommendations; that the respondent father not engage in additional criminal activity including substance abuse.
*173 36. The respondent father, upon paternity being established on March 23, 2015, began visits with the minor child and signed an out of home family services agreement, and agreed to a CCA. Prior to paternity being established, that respondent father indicated that he would not engage in services or visitation until he knew that the minor child was his. The respondent father knew that he might be the father of the minor child since at least October of 2014, due to the efforts made by [DSS] to engage him in the investigative process.
37. The respondent father attended three visits with the minor child, and did not appear for three visits with the minor child, even after the social worker called him to confirm that he would be present. The respondent father scheduled a CCA, but did not appear. He did not attend the Child and Family Team in late April of 2015. In mid-May[,] the social worker called the respondent father to set up a meeting to discuss his missed visits; the respondent father met with the social worker the next day and reported that he needed visitation days and times to change, due to his part-time job. The visitation schedule was changed to accommodate him. The respondent father missed the Child and Family Team on June 3, 2015, and reported that he could not attend because he was just released from the hospital for a medical issue.
38. The respondent father reports that he quit smoking marijuana regularly because his doctor informed him that he was allergic to it; when asked if he could pass a drug test, the respondent father noted that it would still show up in his system, due to his large size.
39. Since the last court date on June 16, 2015, the respondent father did not respond to multiple phone calls made by the social worker. The respondent father's mother ... called ... [DSS] on June 18, 2015 and shared with the social worker that her son-the respondent father-would not engage with ... [DSS] and that he would like for the minor child to be placed with the respondent father's aunt and uncle[.]
40. On July 31, 2015, the social worker attempted another phone call with the respondent father and he answered. The social worker discussed concerns that he was not visiting with the minor child. The respondent father said he was busy starting his own janitorial business and he is often out of town attending trainings. The respondent father said that he is trying to get his life together and he does not have time to pursue reunification with the minor child. The respondent father said he would like for the minor child to live with [his aunt and uncle] if the respondent mother is not able to reunify. The social worker discussed with the respondent father a posting he put on Facebook in regards to his house being raided by the [Drug Enforcement Agency] because they thought he was a crack cocaine dealer. The respondent father admitted that this raid did occur but he does not sell crack cocaine and people have been spreading rumors about him.
....
42. The respondent father has been regularly invited to attend Child and Family Team (CFT) meetings concerning the minor child. The respondent father has failed to attend CFT meetings during the lifetime of this case.
....
50. The respondent father submitted to a CCA ... on March 10, 2016, some nine months after he was ordered to do so by the Court, and well over a year after it was recommended that he do so in his case plan with the Department. As a result, it was recommended that he engage in ... services, follow guidelines of his treatment provider, complete random drug screens, utilize community support groups, participate in drug treatment court, engage in counseling, and complete parenting education classes.
51. The respondent father has not complied with the recommendations of his CCA. He began drug treatment ... in June of 2016 and testified that he will complete his drug treatment classes in December of 2016. He admitted to having a *174 positive drug screen for marijuana and cocaine in June of 2016. The respondent father [h]as started, but not completed an approved parenting class, and has not engaged in counseling.
....
53. The respondent father has not visited consistently with the minor child since September of 2015. The respondent father would call to schedule supervised visitation, then would "no call/no show". The respondent father contacted the [social worker] on March 29, 2016, and requested resumption of supervised visitation. However, the respondent father did not respond to the efforts of the [social worker] to schedule his requested visits, and continued to miss visits with the minor child even after the social worke[r] changed his visitation to accommodate his work schedule.
....
57. Between April 10, 2016, and June 24, 2016, the respondent father missed four visits with the minor child. The respondent father admitted that he has missed visits, and has been late to visits, because he oversleeps.
58. ... The respondent father has pending criminal charges for misdemeanor communication of threat[s] and misdemeanor assault on a female.
The unchallenged findings of fact are binding on this Court. See In re C.B. , 245 N.C. App. 197, 783 S.E.2d 206, 208 (2016) ("Unchallenged findings are binding on appeal.")
However, respondent does challenge other findings of fact, including several findings upon which the trial court relied for its ultimate determination. Finding of fact 41, which the trial court explicitly relies on in its conclusion regarding neglect, states, "The respondent father was made aware that the minor child was being exposed to substance abuse and violence as early as March of 2014, yet took no action to prevent further neglect of the minor child by respondent mother." The trial court's conclusion on neglect, conclusion of law 5, stated that "respondent father has failed to protect the minor child from the neglect of the respondent mother. The respondent father knew of the respondent mother's substance use, and knew that she was exposing the minor child to violence since at least March of 2014." But there was simply no evidence that respondent had any idea of Rudy's mother's substance abuse problems or abuse before DSS involvement.
DSS's brief fails to even address the evidence regarding what respondent knew about Rudy's mother and the guardian ad litem brief places responsibility on respondent to act as a parent long before paternity was established in March of 2015. While there may be certain situations where a man should "know" he is likely the father of a child, this is not one of them. It appears from the evidence that respondent and Rudy's mother had no relationship other than "casual meetings" which were sexual in nature. Furthermore, while we use pseudonyms and will not divulge Rudy's real name, we note Rudy is named after another man whom the mother had identified as a potential father. In other words, Rudy Doe's mother was involved with a man named Rudy Doe. The child was named after another man, and under these circumstances it seems reasonable for respondent to wait until the paternity testing results before he began taking steps to gain custody of Rudy. In fact, respondent's ability to care for Rudy would have been very limited given that he was one of two putative fathers. After April of 2015, Rudy was already in the custody of DSS and not his mother, so it is unclear what steps respondent could have taken to protect Rudy from future neglect by his mother.
Furthermore, while the trial court is not required to make a finding of fact on every single piece of evidence, the trial court does need to resolve material issues. See In re A.B., --- N.C. App. ----, 799 S.E.2d 445, 451 (2017) (noting that a trial court must resolve issues arising from the material evidence); Witherow v. Witherow , 99 N.C. App. 61, 63, 392 S.E.2d 627, 629 (1990), aff'd per curiam , 328 N.C. 324, 401 S.E.2d 362 (1991) ("[T]he trial court need not make a finding as to every fact which arises from the evidence; rather, the court need only find those facts which are material to the resolution of the dispute."). Respondent testified that he now wanted Rudy to live with him, and he had a *175 safe and stable home with his fiancée for Rudy to live in which included a bedroom for Rudy and a playroom. The trial court is not required to believe respondent's testimony, but it must consider the respondent's circumstances at the time of the hearing to make a determination of a likelihood of repetition of neglect. See In re J.H.K. , 215 N.C. App. at 368, 715 S.E.2d at 567. But the trial court made no findings regarding respondent's home or ability to care for Rudy as of the time of the hearing, either positive or negative.
This case presents a situation similar to that in A.B. , where this Court stated, "[W]e believe the evidence would support different inferences and conclusions regarding the likelihood of a repetition of neglect based on evidence regarding respondent['s] circumstances at the time of the hearing. Given the findings of fact, however, we would be speculating as to the trial court's rationale were we to affirm its adjudication[.]" Id. (citation and quotation marks omitted) ("Our review of the transcript reveals that CCDHS social worker Cynthia Bowers and respondent-mother presented testimony that would support additional findings up to the time of the termination hearing. We further believe there are material conflicts in the evidence relating to the issue of respondent-mother's willfulness and the reasonableness of her progress that were not resolved by the trial court's order. Similarly, we believe the evidence would support different inferences and conclusions regarding the likelihood of a repetition of neglect based on evidence regarding respondent-mother's circumstances at the time of the hearing. Given the findings of fact, however, we would be speculating as to the trial court's rationale were we to affirm its adjudication under either N.C.G.S. § 7B-1111(a)(1) or (2)." (citations, quotation marks and brackets omitted)).
There are findings of fact tending to support the ground of neglect, but because there is a material finding of fact not supported by the evidence in that respondent knew of Rudy's mother's parental neglect, and because there is an unresolved issue as to respondent's current housing situation and ability to care for Rudy, we must reverse and remand. We note that respondent has challenged other findings of fact on appeal, and thus other findings of fact may not be supported by the evidence, but we need not review each and every challenged finding as we have already determined that we must reverse and remand with instructions for the trial court to carefully consider the evidence before it, make findings that are supported by competent evidence, make findings that are necessary for the trial court's ultimate determination, and make conclusions supported by those findings. The findings must address the respondent's current circumstances and the possibility of a repetition of neglect. While this direction may seem simple and obvious, we have already noted that the trial court signed an order which included two grounds for termination which should not have been included; in addition, the order included at least one material unsupported finding of fact and failed to address respondent's current circumstances. Respondent makes essentially the same arguments regarding the ground of willfully leaving Rudy in DSS's care without making reasonable progress to correct the conditions which led to his removal as he does for the ground of neglect. The ground of failing to make reasonable progress raises many of the same problems we just noted regarding neglect, and so on remand the trial court must give proper and thoughtful consideration of this ground as well.
IV. Conclusion
For the foregoing reasons, we reverse and remand.
REVERSED and REMANDED.
Judges BRYANT and ZACHARY concur.

A pseudonym is used to protect the identity of the minor involved.